## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AUTUMN BOATNER, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>SSPS, LLC d/b/a SPORTZINO, SCPS LLC d/b/a ZULA CASINO, SOCIAL GAMING LLC d/b/a FORTUNE COINS, BLAZESOFT LTD. and BLAZEGAMES, INC.<br><br>*Defendants*. | Case No. 1:25-cv-3251 |

### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Autumn Boatner brings this case, individually and on behalf of all others similarly situated, against Defendants SSPS, LLC d/b/a Sportzino ("Sportzino"), SCPS LLC d/b/a Zula Casino ("Zula"), Social Gaming LLC d/b/a Fortune Coins ("Fortune Coins"), Blazesoft Ltd. ("Blazesoft"), and Blazegames, Inc. ("Blazegames") (collectively, "Defendants") to enjoin their operation of illegal online casino games and to seek restitution, damages, and other appropriate relief. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and upon information and belief as to all other matters.

### NATURE OF THE ACTION

1.    This action arises from a predatory scheme orchestrated by Defendants through their illegal online casinos—Sportzino, Zula, and Fortune Coins. Defendants lure consumers to their platforms by falsely marketing them as free-to-play "sweepstakes" casinos when, in reality, they operate as unregulated gambling traps where users wager and lose real money playing virtual slot machines and other casino-style games of chance over the Internet.

2.    At the heart of Defendants' "sweepstakes" casino model is a dual currency system

deliberately crafted to obscure the fact that users are engaging in real-money gambling. Consumers purchase "Gold Coins," which can be used to play "free" casino games but are not redeemable for real money outside of the platforms. However, each purchase of Gold Coins is bundled with so-called "Sweepstakes Coins"—or, on the Fortune Coins platform, "Fortune Coins"—which can be wagered on games of chance and redeemed for cash. (Sweepstakes Coins and Fortune Coins are collectively referred to herein as "Sweeps Coins"). For every dollar spent on Gold Coins, players receive a proportional number of Sweeps Coins, exposing Gold Coins as a thin veil concealing the reality that players are effectively purchasing Sweeps Coins to engage in real-money virtual gambling.

3.     Virtual gambling is highly addictive and strictly regulated in New York. By law, games of chance can only be offered in a few designated facilities throughout the State, where the New York State Gaming Commission ensures fair play and enforces consumer protection standards.

4.     By enabling New York residents to purchase Sweeps Coins, wager them on games of chance over the Internet, and redeem them for real money, Defendants are effectively operating unlicensed and illegal online casinos. And without any oversight, Defendants flout New York gambling regulations by, for example, allowing individuals under the age of 21 to gamble on their platforms in violation of state law designed to protect minors, N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 1332(1), 1362, 1367(4); N.Y. Comp. Codes R. & Regs. tit. 9, § 5329.19(a), and failing to provide gambling addiction resources for problem gamblers. N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1404; N.Y. Comp. Codes R. & Regs. tit. 9, §§ 5313.2, 5325, 5327, 5329.

5.     Defendants' misconduct inflicts particularly severe harm on vulnerable populations, including individuals predisposed to gambling addiction and younger consumers

targeted through "free play" marketing. Defendants aggressively market and promote their online casinos on social media platforms, using deceptive tactics to entice users into engaging with their seemingly harmless games. By masking real-money gambling as "sweepstakes" promotions, Defendants create a dangerously misleading environment that fosters unchecked gambling in New York—precisely the harm that the New York Legislature sought to prevent. This deliberate obfuscation exposes unsuspecting New York consumers to significant risks of financial ruin, psychological distress, and compulsive gambling addiction.

6.      Accordingly, Plaintiff, on behalf of herself and other similarly situated individuals, brings this lawsuit to expose Defendants' predatory practices, recover funds lost by their victims, and dismantle their deceptive and unregulated gambling operations.

## PARTIES

7.      Plaintiff Autumn Boatner is a natural person and citizen of the State of New York.

8.      Defendant SSPS, LLC d/b/a Sportzino is a Delaware limited liability company with its business address listed as 1201 North Market Street, Suite 111, Wilmington, Delaware. The sole member of Sportzino is Blazegames. Sportzino is owned, controlled, and operated by Blazesoft from Ontario, Canada.

9.      Defendant SCPS LLC d/b/a Zula is a Delaware limited liability company with its business address listed as 1201 North Market Street, Suite 111, Wilmington, Delaware. The sole member of Zula is Blazegames. Zula is owned, controlled, and operated by Blazesoft from Ontario, Canada.

10.      Defendant Social Gaming LLC d/b/a Fortune Coins is a Delaware limited liability company with its business address listed as 1201 North Market Street, Suite 111, Wilmington, Delaware. Fortune Coins is owned, controlled, and operated by Blazesoft from Ontario, Canada.

11.    Defendant Blazesoft Ltd. is a Canadian limited corporation with its principal place of business located at 7880 Keele Street, unit 501, Concord, Ontario, L4k 4G7, Canada. Blazesoft owns and controls Blazegames, Sportzino, and Zula.

12.    Defendant Blazegames, Inc. is a Delaware corporation with its principal place of business located in Ontario, Canada. Blazegames is the sole member of SSPS, LLC and SCPS LLC. Blazegames is owned, controlled, and operated by Blazesoft from Ontario, Canada.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than any Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

14.    This Court has personal jurisdiction over Defendants because they conduct substantial, continuous, and systematic business in New York—including by entering into contracts with New York residents and engaging in ongoing economic relationships with them. Furthermore, Defendants purposefully directed their activities in the District by providing services to the residents of this District that they knew would be used within this District, advertising their services in New York, and actually profiting from the resulting illegal gambling taking place in the state on their platforms.

15.    Venue is proper in this District under the provision of 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial District, each Defendant is subject to personal jurisdiction in this District, and Defendants transact business in this District. Further, venue is proper as to Blazesoft and Blazegames under 28 U.S.C. § 1391(c)(3) as they are foreign entities.

## STATEMENT OF FACTS

I. **Blazesoft Owns, Operates, Funds, and Controls the Fortune Coins, Sportzino, and Zula Online Casinos.**

16.    Blazesoft is a limited company based in Ontario, Canada that describes itself as "a pioneering force in the online entertainment industry, dedicated to redefining the boundaries of entertainment through cutting-edge technology and innovative gaming experiences."[1]

17.    Blazesoft owns, operates, and controls the Sportzino, Zula, and Fortune Coins online casino platforms. According to Blazesoft's Chief Executive Officer, Mickey Blayvas, "Fortune Coins, Zula Casino, and Sportzino each reflect our ultimate ambition to being the number one player in the market."[2]

18.    Blazesoft created Blazegames and its U.S.-based casino entities—Sportzino, Zula, and Fortune Coins—to evade regulators, mask illegal online gambling operations, and insulate itself from liability. Blazesoft exercises complete control over every aspect of these entities, including corporate strategy, daily operations, financial decisions, and customer relations. This control is evident from Blazesoft's public statements, shared management, and the lack of independent offices, employees, or assets associated with Blazegames and the casino entities. Blazesoft's deliberate misuse of the corporate structure constitutes an abuse designed to defraud consumers, evade legal responsibilities, and inflict significant financial and emotional harm on U.S. residents.

    A.    **Blazesoft Launched Sportzino and Zula Following the Massive Success of Its Flagship Fortune Coins Casino Platform.**

---

[1]    *Sprotzino.com Celebrates 1 Sensational Year of Success*, PR NEWSWIRE (Dec. 18, 2024), https://perma.cc/8BFD-VRA9.

[2]    *Blazesoft introduces its latest venture Zula Casino and reveals a $10M investment into its upcoming sports venture*, PR NEWSWIRE (Oct. 2, 2023), https://perma.cc/7QQN-FXY9.

19.     Blazesoft introduced Fortune Coins—its first online casino "with sweepstakes elements"—to U.S. consumers in April 2022, attracting more than 1.5 million registered users by the end of its first year. In a press release marking the platform's one-year anniversary, Fortune Coins and Blazesoft CEO, Mickey Blayvas, stated that "In April 2022, our team set a goal to achieve a significant increase in the market share within a year, and we did it!"[3] According to various press releases, as well as its own website, Fortune Coins is "owned by Blazesoft."[4]

20.     Building on this initial success, Blazesoft launched Zula Casino on October 2, 2023. In a press release issued the same day, Blazesoft called Zula a new casino "with sweepstakes" that "features hundreds of casino-style slots, fish, and crash games supplied by the leading gaming providers across the globe," and "offers daily jackpots, tournaments, a loyalty program, and captivating promotions in an effort to always improve the player experience."

21.     Blazesoft Senior Vice President of Business Operations, Yuliy German, explained that "Zula Casino's launch marks a significant milestone in Blazesoft's journey to redefine the gaming experience. In keeping with our unwavering commitment to provide unparalleled entertainment, we're excited to offer players a truly engaging and enjoyable platform that uniquely blends social gaming with sweepstakes elements."[5]

22.     Blazesoft's October 2, 2023 press release also noted that:

Blazesoft's plans to scale don't stop with Zula Casino. *The company announced a $10 million investment into its future sports brand, Sportzino.com.* First of its kind, Sportzino will blend the worlds of social sports and casino-style gaming, offering a diverse range of sports and leagues, virtual sports, esports, hundreds of slots,

---

[3]     *FortuneCoins.com Celebrates 1st Anniversary With An Epic Marketing Campaign*, PR NEWSWIRE (Apr. 4, 2023), https://perma.cc/QB6P-6288.

[4]     *Fortune Coins Partners Up With Let Us Entertain You Inc.*, WJTV.com (May 3, 2023), https://www.wjtv.com/business/press-releases/cision/20230503TO88927/fortune-coins-partners-up-with-let-us-entertain-you-inc/.

[5]     *Blazesoft introduces its latest venture Zula Casino and reveals a $10M investment into its upcoming sports venture*, *supra* note 2.

bingo, and other game categories, daily tournaments, contests, and promotions. (Emphasis added).[6]

23.    Six weeks later, Blazesoft announced the launch of Sportzino through a press release issued on December 12, 2023:

> Blazesoft, a leading provider of online gaming platforms, is excited to announce the launch of Sportzino.com, a groundbreaking brand that combines the thrill of social casino gaming with sports predictions. Sportzino has gone live a month ahead of its planned release, and is set to revolutionize the free-to-play gaming experience in the U.S. market.
>
> *        *        *
>
> Blazesoft, parent company of Sportzino.com, has experienced impressive growth and achieved market dominance over the past two years, particularly with the success of its flagship brand, Fortune Coins, which attracted over 4 million registered users in the US and Canada in under two years. Building on this achievement, the company introduced Zula Casino, another social casino with sweepstakes elements in September 2023. Learning from the experiences of Fortune Coins, Blazesoft team applied valuable insights to Zula, making it even more promising.[7]

24.    Blazesoft Senior Vice President of Business Operations, Yuliy German, stated:

> We are excited to bring millions of new gaming enthusiasts into our one-of-a-kind product, brought to players by the same best-in-class team who delivered Fortune Coins Casino and Zula Casino. The launch of Sportzino.com marks a significant milestone for Blazesoft group and the gaming industry as a whole. With a constant focus on putting the player experience first, Sportzino.com is poised to hit the ground running and redefine the free-to-play sports predictions and social gaming sector in the U.S.[8]

25.    Blazesoft understood that aggressive marketing and advertising campaigns were critical to the success of its casino platforms. When Sportzino launched, Blazesoft's Head of Strategic Partnerships and Marketing, Yuliya Ivanisova, announced that:

> Sportzino.com has tremendous potential in the US market and beyond. With our

---

[6]    *Id.*

[7]    *Blazesoft Launches Sportzino.com to the U.S. Market, a Revolutionary Platform of Social Sportsbook and Casino*, PR NEWSWIRE (Dec. 12, 2023), https://perma.cc/Z9GX-NPER.

[8]    *Id.*

starting estimated marketing budget of over $10 million for 2024, we are confident in our ability to establish Sportzino.com as a leading social gaming platform in North America. We are committed to continuous investment in this brand to meet the evolving needs of our players. We anticipate rapid growth and expansion in the next months, creating new opportunities for players and affiliate partners.[9]

**B.**  **Fortune Coins (Social Gaming LLC), Sportzino (SSPS, LLC) and Zula (SCPC LLC) are Sham Entities Controlled by Blazesoft from Ontario.**

26.     Fortune Coins, Sportzino, and Zula were set up to appear as though they are legitimate companies with business addresses located in Delaware, but as shown below, they are actually sham companies that have no offices, employees, assets, or control over any aspect of the online casinos they purport to operate.

27.     To that end, Fortune Coins, Sportzino, and Zula represent to consumers through their terms of service, which are virtually identical, that their "business address" is located at 1201 North Market Street, Suite 111, Wilmington, Delaware. But this "business address" is merely a virtual office operated by a company called Opus Virtual Offices, LLC that Blazesoft chose to use as a corporate mailing address. There are no Fortune Coins, Sportzino, or Zula employees, business assets, or business operations located at this address.

28.     All three casinos also disclose so-called "registered" addresses on their respective websites. Fortune Coins lists "2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808, USA" and both Sportzino and Zula list 850 New Burton Road, Suite 201, Dover, Delaware 19904." However, these "registered" addresses are actually owned by unrelated third-party companies that provide remote registered agent services. None of the casinos maintain employees, business assets, or business operations at these addresses.

29.     Despite Blazesoft's superficial attempt to create the appearance that its illegal

---

[9]     *Id.*

casinos are based in and operated from Delaware, Sportzino and Zula recently admitted through a court filing in *SCPS, LLC, et al. v. Kind Law, et al.*, No. 24-cv-02768, dkt. 1 (D.D.C. Sept. 27, 2024), that "[t]he Zula and Sportzino websites are administered and provided from, and all customer interactions are *handled exclusively from their affiliates' offices located in Ontario, Canada*," *id.* ¶ 3, and "Zula and Sportzino operate free-to-play social gaming websites that are *provided and administered from Ontario, Canada*," *id.* ¶ 13 (emphasis added). In a declaration filed in that same case, Yuliy German admitted that "Blazesoft provides support services to Zula Casino and Sportzino, including the management of customer intake systems, maintenance of customer accounts and customer databases, and other interactions with customers. As the Senior Vice President of Business Operations, [German has] overall management accountability for these operations." *SCPS LLC*, No. 24-cv-02768, dkt. 3-1, ¶ 5 (D.D.C. Sept. 27, 2024).

30.    The Terms and Conditions for all three casinos are virtually identical (and cited collectively herein as "Terms" unless otherwise noted), provide further evidence that Fortune Coins, Sportzino, and Zula are sham corporate shells operated, owned, funded, and controlled by Blazesoft. Specifically, the relevant Terms state that:

> (a) "All Content is subject to and protected under the intellectual property rights and is *solely owned by Blazesoft Ltd*." Terms ¶ 1.1.2 (emphasis added). The term "Content" is defined to mean "all information, Games including sports prediction games, funpicks games, Documentation, images, text, data, links, documents, software, Sweeps Coins, Gold Coins, or other materials accessible and available to Users through our Website or Mobile Application." *Id.* (emphasis added)[10];

---

[10]    *Sportzino Terms and Conditions*, Sportzino.com (updated Jan. 15, 2025), https://web.archive.org/web/20250303225018/https://sportzino.com/terms-and-conditions; Terms and Conditions, *Zula Casino Terms and Conditions*, Zulacasino.com (updated Dec. 10, 2024), https://web.archive.org/web/20250215190921/https://www.zulacasino.com/terms-and-conditions; Terms and Conditions of Use, fortunecoins.com (updated Dec. 3, 2024). https://web.archive.org/web/20250217035221/https://www.fortunecoins.com/terms-and-conditions.

(b) the Fortune Coins, Sportzino, and Zula websites, as well as all "Content and Service" provided is *"fully owned by Blazesoft Ltd*." Terms ¶ 1.1.22 (emphasis added); and

(c) "All Content available on the Website and Mobile Application is the *sole and exclusive property of Blazesoft Ltd*. Any applicable third-party content is duly licensed to Blazesoft Ltd. Blazesoft Ltd. owns the sole title, sole ownership and legal interest in the trademarks, trade names, logos, patents, patent applications, web domains related to the Content, inventive steps and ideas, trade secrets, copyrights, whether registered or not, in all jurisdictions where the Content are available for the Users." Terms ¶ 14.1 (emphasis added).

31.     These provisions clearly state that Blazesoft "solely" and "fully" owns everything on the Fortune Coins, Sportzino, and Zula websites, including the websites themselves and all content, services, and intellectual property provided and displayed.

32.     The LinkedIn profiles for Blazesoft's executives and employees provide further evidence of their direct control, management, development, and operation of Fortune Coins, Sportzino and Zula.

33.     For instance, Blazesoft's Chief Executive Officer, Mickey Blayvas, prominently identifies Fortune Coins, Zula Casino and Sportzino in his employment biography next to his role as "CEO @ Blazesoft":



34.     And press releases have identified Blayvas as the Chief Executive Officer of

10

Fortune Coins in addition to Blazesoft.[11]

35.     Similarly, Blazesoft's Chief Commercial Officer, Yuliya Ivanisova, identifies Fortune Coins, Zula Casino, and Sportzino in her employment biography, and represents that she "lead[s]" Blazesoft's "efforts in building partnerships and marketing our brands—Fortune Coins, Zula, Sportzino, and Yay Casino. Our goal is to provide top-notch, free casino-style entertainment to players in the U.S. and Canada":



36.     Blazesoft's in-house counsel, Raghav Ghei, also prominently identifies Fortune Coins, Zula, and Sportzino is his employment biography:



37.     Not even the "Head of Sportzino," Dmytro Uzundai, asserts that he is employed by Sportzino itself. Instead, his LinkedIn profile indicates that he is employed as a "Program Manager

---

[11]     *FortuneCoins.com Celebrates 1st Anniversary With An Epic Marketing Campaign*, *supra* note 3.

at Blazesoft":



38.    These LinkedIn profiles further demonstrate Blazesoft's ownership, control, and operation of the Fortune Coins, Sportzino, and Zula casino platforms and underscore that each entity is a sham corporate shell with no employees or assets of its own.

## II.    Fortune Coins, Sportzino, and Zula are Online Casinos That Facilitate and Profit Enormously From Real-Money Gambling.

39.    Lawful gambling has historically been limited to physical casinos or authorized venues where regulatory agencies and oversight bodies closely monitor gambling operations and enforce compliance with established standards. These controlled environments are designed to protect consumers by promoting fairness, ensuring transparency, and maintaining safeguards against exploitation and misconduct.

40.    With advancements in technology, gambling has expanded beyond physical venues to online platforms, creating new opportunities and challenges for regulators. States that permit online gambling have adapted their legal frameworks to uphold the same standards of consumer protection and regulatory accountability established for traditional casinos.

41.    In states where online gambling is permitted, casino platforms are required to operate transparently, offering clear money-for-chance exchanges that are explicitly acknowledged as gambling and are subject to strict regulatory oversight to ensure compliance with state laws.

42.     New York generally prohibits all commercial gambling, with limited exceptions.[12] *See* N.Y. Const. art. I, § 9; Gen. Oblig. L. § 5-401. This prohibition reflects the State's public policy against online gambling. *See Ramesar v. State*, 224 A.D.2d 757, 759, 636 N.Y.S.2d 950 (1996) (noting New York's "[p]ublic policy continues to disfavor gambling."). The regulatory scheme ensures that consumers are not exposed to the risks of fraudulent or predatory practices commonly associated with such operations, especially where, as here, they are accessible 24 hours-a-day, 7 days-a-week through computers and mobile devices. *See, e.g.*, Sportzino, Home Page, sportzino.com (last visited Apr. 15, 2025) ("Our platform is perfectly adapted to every iOS or Android-powered device out there. As such, you can make sports predictions and play games even on smartphones and tablets. The same sophisticated interface and simple layout is what you'll find when playing on mobile devices. So, even if you're used to the desktop site, you'll have no issues navigating the mobile platform."); Zula Casino, Home Page, zulacasino.com (last visited Apr. 17, 2025) ("Our library is stacked with titles from industry-leading providers, and thanks to Zula Casino's intuitive platform, you can play these games on any device of your choice"); Fortune Coins, About Us, fortunecoins.com/about-us (last updated Aug. 23, 2024) (touting that "hundreds of thrilling games [are] accessible seamlessly on both desktop and mobile devices").

43.     Defendants blatantly disregard New York's clear prohibition on gambling. As discussed further below, the Fortune Coins, Sportzino, and Zula casino platforms allow users to purchase and wager "Sweeps Coins"—digital tokens that, like chips in a brick-and-mortar casino, can be redeemed for real money—on games of chance, including slot machines, bingo, and other

---

[12]     New York Penal Law defines gambling as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome." N.Y. Penal Law § 225.00(2).

casino-style offerings. Effectively, Defendants operate unlicensed and illegal online casinos within New York.

A. **Defendants' Casino Games are Games of Chance.**

44.     Defendants' casino platforms host casino-style games that are unmistakably games of chance, including slot machines and bingo. The outcomes of these games are entirely determined by algorithms designed to simulate randomness, with no opportunity for skill or strategy to influence the results.

45.     Under New York law, a game of chance is any "contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." N.Y. Penal Law § 225.00(1); *see also White v. Cuomo*, 38 N.Y.3d 209, 228, 192 N.E.3d 300 (2022) (holding that the Constitutional prohibition on gambling reaches "the staking of value on a game in which the element of chance predominates over the element of skill[.]"). Defendants' games fall squarely within this definition because players on Defendants' platforms wager Sweeps Coins on virtual slot machines where results are dictated entirely by random number generators ("RNGs"), replicating the mechanics of physical slot machines in brick-and-mortar casinos.

46.     Defendants emphasize the chance-based nature of their games to lure players with the promise of big payouts. On their websites, Defendants highlight the possibility of winning large sums, with messaging such as "spin to win" or "test your luck." These promotional tactics not only underscore the games' reliance on chance but also aim to foster the addictive hope of landing significant financial rewards.

47.     The games' reliance on chance is further demonstrated by the absence of any skill component. Slot machines, for example, require players to simply press a button to spin the reels

with outcomes wholly determined by RNGs. Other games, such as bingo and scratch cards, similarly involve no elements of skill, relying solely on luck to determine winners and losers.

48.     Defendants' game design deliberately replicates the hallmarks of licensed, chance-based casino games to create an authentic gambling experience. From spinning reels and celebratory animations to jackpot symbols and dynamic sound effects, all of the games provided on Defendants' platforms evoke the same psychological triggers that drive gambling behaviors in brick-and-mortar casinos.

49.     By offering these games of chance, Defendants are operating unregulated online casinos in violation of New York law, which explicitly prohibits gambling on games of chance unless expressly authorized. Their deliberate use of these chance-based games further underscores the unlawful nature of their platforms and the harm they perpetuate.

**B.     The Dual Currency System.**

50.     Defendants attempt to circumvent this prohibition of online gambling—and similar prohibitions in other states—by branding their casino games as free to play, so-called "sweepstakes" games. The core of Defendants' "sweepstakes" casino model is a dual currency system deliberately designed to obscure the fact users are engaging in real-money gambling. Players on Sportzino and Zula are introduced to two types of virtual currency: Gold Coins ("GCs"), which purportedly hold no monetary value and are marketed as being solely for entertainment purposes, and Sweeps Coins ("SCs"), which can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar and serve as the gateway to Defendants' illegal gambling operations.

51.     Fortune Coins uses essentially the same dual currency system, except its redeemable currency is called "Fortune Coins," which can be redeemed for real money at a 100:1 exchange rate to the U.S. Dollar. (For clarity, Sweeps Coins and Fortune Coins are collectively

referred to herein as "Sweeps Coins").

52.     On all three platforms, Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited number of Gold Coins through daily logins or promotions and then must purchase more Gold Coins to keep playing. Defendants emphasize that Gold Coins are non-redeemable in an effort to support their claim that their games are "free-to-play." However, Defendants bundle these purchases with Sweeps Coins, which can be used to wager on the same casino-style games as Gold Coins.

53.     While Defendants insist that "NO PURCHASE OR PAYMENT IS NECESSARY TO OBTAIN Sweeps Coins," this is incredibly misleading. It is true that players can obtain a limited number of Sweeps Coins as bonuses for one-time "promotions," such as by initially signing up to use Defendants' services, completing an onerous mail-in request to obtain five Sweeps Coins, or linking the player's Facebook account. But the only way a player would even know about these "free" methods of obtaining Sweeps Coins is if they found Defendants' "Sweeps Rules" Terms—which are not conspicuously linked anywhere in the casino games—and combed through the fine print. In fact, the only advertised way of obtaining Sweeps Coins is to purchase bundled packages of Gold Coins and Sweeps Coins. For example, when Sportzino players run out of Sweeps Coins, a message is displayed that directs them to "top up" their account (i.e., purchase more Sweeps Coins), as shown below in Figure 1:



**(Figure 1)**

54.     This message directing players to "top up" with Sweeps Coins is displayed even when the players have an abundance of Gold Coins in their account.

55.     Even if a player could figure out how to get a limited allotment of free Sweeps Coins, the only way to immediately get more once that allotment is depleted is to purchase more.

56.     To obtain more Sweeps Coins, players must purchase coin bundles containing both Gold Coins and Sweeps Coins. Defendants characterize these transactions as primarily Gold Coin purchases with Sweeps Coins supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Sweeps Coins.

57.     For every dollar spent on the coin bundles, players receive a nearly equivalent amount of Sweeps Coins, as illustrated below in Figures 2 and 3. For example, in the Sportzino Coin Store, $19.99 buys 20.50 Sweeps Coins and 750,000 Gold Coins, and $49.99 buys 51.50 Sweeps Coins and 2,000,000 Gold Coins.



**(Figure 2, Zula Casino Coin Store)**



**(Figure 3, Sportzino Coin Store)**

58.     The Fortune Coins platform employs the same model but given its 100:1 redemption ratio, players receive 100 times the number of Fortune Coins in similarly priced bundles, as illustrated below in Figure 4. For example, $19.99 buys 2,020 Fortune Coins and 4,040,000 Gold Coins, and $49.99 buys 5,100 Fortune Coins and 10,200,000 Gold Coins.



**(Figure 4, Fortune Coins Coin Store)**

59.     These pricing structures clearly show that Gold Coins serve merely as superficial cover for the transaction of Sweeps Coins.

60.     Consumers can make purchases from Fortune Coins and Zula Casino using Visa, Mastercard, and Skrill, and can make purchases from Sportzino using Visa, Mastercard, and Discover.

61.     In-game prompts also betray the fact that Defendants know that players are really purchasing Sweeps Coins when they make a Gold Coins purchase. For example, Defendants prompt players to purchase more Gold Coins (bundled with Sweeps Coins) once they have depleted their Sweeps Coins even if the players still have a cache of Gold Coins available to them.

62.     Plaintiff Boatner and, on information and belief, the vast majority of players on Defendants' platforms, regularly buy additional coin bundles when they run out of Sweeps Coins even when they already possess hundreds of thousands or even millions of unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirms that these transactions are driven entirely by the desire to obtain Sweeps Coins for real-money gambling, rather than for the Gold Coins Defendants claim to sell.

63.     Defendants' dual currency structure transforms what appears to be innocuous gaming platforms into unregulated online casinos where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

C.     **The Dual Currency System and Game Design Encourages Players to Wager Real Money.**

64.     Every aspect of Defendants' dual currency system is designed to encourage the

transition from Gold Coins to Sweeps Coins. Indeed, Zula tells consumers that:

> After enjoying free gameplay with your Gold Coins, you can switch to Sweeps Coins and take your gaming experience to the next level. They work similarly to GCs; the only difference is that you can reclaim your SC winnings . . . You can also bulk up your SC coins by making a purchase at our store.[13]

65.    Likewise, Fortune Coins tells consumers that "as a sweepstakes casino, we offer the best entertainment for free and the potential to exchange Fortune Coins (our version of Sweeps Coins) for big bonuses."[14]

66.    Sportzino's efforts to transition consumers to Sweeps Coins is even more deceptive, telling consumers that, "Like Gold Coins, *you use SCs to play slots for free*. However, they are more valuable because you can exchange them for gifts. Just note that you can't purchase Sweeps Coins. Instead, you receive them through promotions or bonuses when you buy Gold Coins."[15] (Emphasis added.)

67.    To participate in Defendants' games, users choose whether to wager Gold Coins or Sweeps Coins, as shown in Figures 5, 6, and 7, below:



**(Figure 5, Sportzino Game Play)**

---

[13]    Zula Casino, Home Page, zulacasino.com (last visited Apr. 17, 2025).
[14]    Fortune Coins, Home Page, fortunecoins.com (last visited Apr. 17, 2025).
[15]    Sportzino, Sweep Slots, sportzino.com/public-lobby/slots (last visited Apr. 17, 2025).



**(Figure 6, Zula Game Play)**



**(Figure 7, Fortune Coins Game Play)**

68.     At the top of all three game screens displayed in Figure 5-7 are toggles where players indicate—through a click of their mouse or tap on their mobile device—whether they want to wager Gold Coins or Sweeps Coins. The selected currency is highlighted in full color, while the non-selected option appears faded. Figures 5-7 illustrate the screens as they appear when a player chooses to wager Sweeps Coins.

69.     This seamless toggle between currencies is present in every game. Defendants' toggle design lures players into wagering real money, often without fully understanding the shift from "free play" to real-money gambling.

70.     By creating an illusion of risk-free entertainment, Defendants' platforms manipulate users into participating in activities that carry severe financial and emotional

consequences. Many players are misled into believing they are engaging in harmless gaming, only to find themselves spending significant sums of money chasing Sweeps Coin winnings. Defendants' platforms use celebratory animations, sound effects, and other psychological triggers—hallmarks of traditional slot machines—to keep players engaged and spending. This manipulation disproportionately affects vulnerable populations, including individuals susceptible to gambling addiction, who may not recognize the financial stakes until they have already suffered significant losses.

71.    What's more, Defendants do not allow Sportzino and Zula players to cash out until they win at least 50 Sweeps Coins after meeting certain "Playthrough Requirements." Sportzino's Sweeps Rules give the following example: "if a Participant receives 100 Sweeps Coins and those Sweeps Coins have a Playthrough Requirement multiplier of 2x, a Participant must play games totaling [*sic*] 200 Sweeps Coins prior to those Sweeps Coins being eligible for redemption as a Reward."[16]

72.    These rules are intentionally opaque, so an example is helpful in illustrating how these "Playthrough Requirements" work: If a player pays $99.99 for 104 Sweeps Coins with a 2x Playthrough Requirement, the player must wager each of those Sweeps Coins twice before she can cash out. Now, let's say the player wagers the Sweeps Coins the first time and only wins 52 Sweeps Coins (losing half of the wagered Sweeps Coins). The player will be unable to cash out—even if she doesn't want to risk the remaining $52 worth of Sweeps Coins—until she wagers them again. The real kicker is that if, after wagering the coins a second time, the player only wins 26 Sweeps Coins, she will be entirely unable to cash out because Sportzino has a 50 Sweeps Coin cash out

---

[16]    *Sportzino Sweeps Rules*, Sportino.com/sweeps-rules (updated Mar. 28, 2025) https://sportzino.com/sweeps-rules.

minimum. Accordingly, if the player wants to get any of her money back, she will have to buy and wager *more* Sweeps Coins to try to meet that minimum.

      **D.**      **Defendants Offer Gambling Without Statutory Consumer Protections.**

73.    The harm inflicted through this dual currency system is further exacerbated by Defendants' lack of accountability and regulatory oversight. Unlike licensed casinos, which must comply with strict requirements to ensure fairness, transparency, and consumer protections, Defendants operate without these safeguards. The absence of oversight leaves players vulnerable to unfair practices, such as manipulated game outcomes, misleading promotions, and nonexistent or inadequate mechanisms to address problem gambling.

74.    This is not just a theoretical danger—Defendants' online casinos actively undermine critical consumer protections required by New York law. For example, Defendants allow anybody over the age of 18 to gamble on its casino platforms in complete disregard for the laws prohibiting individuals under the age of 21 to gamble in New York. *See, e.g.*, N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor."); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and

immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities."); § 5329.19(a) ("No person under 21 years of age may place a wager with a casino sports wagering licensee").

75.    Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9 § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877-8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission."); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.1(b) ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from

all New York State licensed gaming facilities."); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements.")

76.    Instead of providing meaningful resources to address problem gambling, Defendants offer only a superficial and misleading commitment to "Responsible Social Gameplay," framing the issue as excessive video game use rather than gambling addiction. The support services listed on Defendants' websites (which are virtually identical) underscore the absurdity of this approach. For example, consumers are directed to "Gaming Addicts Anonymous," an organization designed to assist individuals struggling with video game addiction—not gambling addiction. Other suggested resources include the Substance Abuse and Mental Health Services Administration, which addresses broad mental health and substance use issues, and the Financial Counseling Association of America, which focuses on credit counseling and debt management. None of these resources are specific to gambling addiction, further exposing Defendants' failure to address the actual harm caused by their platforms. This token effort to feign responsibility demonstrates Defendants' deliberate attempt to obscure the true nature of their operations and evade accountability for the significant harm they inflict.

## III.    Defendants Deceptively Market Fortune Coins, Sportzino, and Zula as "Sweepstakes" Casinos to Lure Consumers In and Obscure the True Nature of Their Illegal Gambling Operations.

77.    Defendants market their online platforms as "sweepstakes" casinos to lure consumers to wager on games of chance under the guise of free play and harmless entertainment.

78.    Sportzino, for example, describes itself as a "Sweepstakes Sportsbooks and Casino" and a "Free to Play Social Sportsbook and Casino." It boasts a vast array of offerings, inviting consumers to "Play 1,000+ games: slots, scratch cards, crash games, table games, bingo, and much

more!" The website's messaging is designed to entice players with promises like, "We are not just offering you access to unlimited fun; we're also giving you a chance to win big in the process," and "Our sweepstakes model offers you the chance to win free coins, which can be used on any game in our collection. Enjoy thrilling slots and sports events, and get the opportunity to redeem exciting rewards!"

79.    Similarly, Zula brands itself as an "online sweeps casino," "free sweeps casino," "social sweeps casino," and "online social casino." Its website invites U.S. players to "enjoy their favorite casino-style games for free" and touts the platform as "a new sweepstakes casino available to US players." Zula further promises of "Countless Bonuses and Promotions at Zula Sweepstakes Casino in the USA," suggesting an experience filled with free play and rewards.

80.    Fortune Coins likewise describes itself as the "premier sweepstakes casino dedicated to providing free, top-quality entertainment for players across the United States." On its homepage, Fortune Coins invites players to "Unleash the Bonus Features" and says that "with thrilling bonus features, you can elevate your gameplay and take your winnings to the next level! At Fortune Coins social sweepstakes casino, we've packed our games with these bonus features."

81.    These carefully crafted messages and branding strategies are intended to obscure the true nature of Sportzino, Zula, and Fortune Coins as unlicensed online casinos where players wager real money through a deceptive system of "free" gameplay and misleading rewards. All three platforms present themselves as sweepstakes or social gaming experiences, while at the same time encouraging consumers to engage in what amounts to real-money gambling.

**A.    Defendants Deceive Consumers into Believing Their Illegal Casinos are Legal.**

82.    Defendants fraudulently represent to consumers through the Fortune Coins, Sportzino, and Zula terms of service that their platforms **"DO NOT OFFER REAL MONEY**

GAMBLING." (emphasis in original.) This false representation leads consumers to believe that they are not actually engaging in real money gambling on Defendants' platforms, even when wagering with Sweeps Coins.

83.    Defendants further fraudulently represent to consumers that their online casino platforms are "legal" and in compliance with state and federal law. Specifically, Sportzino's website promises consumers that "Sportzino complies with the laws of every jurisdiction that it operates in." Zula's and Fortune Coins' website makes similar promises.

84.    All three platforms attempt to give consumers in New York (and elsewhere) additional comfort that they are not violating the law by identifying certain states where the platform is prohibited, thus creating the false and deceptive impression that Defendants are being transparent about the legality of their platforms. Fortune Coins even represents to consumers that "[o]ur sweepstakes model *complies with the law,* making it a *100% legitimate platform*." (emphasis added.) Zula likewise claims that its casino "is legal and available in most US states. Currently, only players in Idaho, Washington, Georgia, and Michigan can't register and use our sweepstakes model. You must also be 18 years or older to create an account at Zula U.S. sweepstakes casino."[17] Sportzino's and Fortune Coins' Terms also purport to exclude players in these states from participation.

**B.    Defendants Aggressively Advertise Fortune Coins, Sportzino, and Zula on Social Media.**

85.    Defendants leverage extensive and targeted social media campaigns to promote their casino platforms, reaching millions of potential players across platforms such as Facebook,

---

[17]    James, *Fortune Coins Social Casino Review – Is it legit and safe to play?*, fortunecoins.com (Oct. 8, 2024), https://news.fortunecoins.com/guides/fortune-coins-social-casino-review-is-it-legit-and-safe-to-play/.

Instagram, TikTok, and X. Their advertisements are designed to captivate users with bold claims,

exciting visuals, and the promise of big rewards, examples of which are shown in Group Figures

8 and 9, below:



**(Figure 8, Examples of Sportzino Ads on Social Media)**



**(Figure 9, Examples of Zula Casino Ads on Social Media)**

86.     These advertisements are carefully crafted to exploit the appeal of gambling while

concealing the platforms' true nature as unregulated online casinos. By using flashy graphics,

celebratory animations, and enticing language such as "Play for Free," "Highest Multiplier," and

"Spin to Win," Defendants mislead consumers into believing they are engaging in harmless

entertainment rather than real-money gambling.

87.    Likewise, Fortune Coins' advertisements frequently feature videos of players gambling with Fortune Cash and winning large amounts of money, as illustrated in Figures 10 and 11 below:



(Figure 10)                                    (Figure 11)

88.    Figures 10 and 11 show screenshots of videos that Fortune Coins has prominently posted on its Instagram account. The player in both videos is shown winning Fortune Coins (FC) while placing wagers on slot games. By showcasing players achieving substantial wins, Fortune Coins strategically employs social proof and aspirational marketing to give the misleading impression that large payouts are common, enticing users to shift from casual play into real-money gambling with Fortune Coins.

89.    Defendants use social media platforms to target specific demographics, including younger audiences and vulnerable individuals, through personalized ads and promotional campaigns. As shown above, these ads often highlight the platforms' accessibility and offer bonuses for signing up. By leveraging data-driven advertising strategies, Defendants ensure their promotions reach individuals most likely to engage with their platforms, further amplifying the harm caused by their deceptive practices.

90.    Through their aggressive and misleading social media campaigns, Defendants have

succeeded in creating a broad user base, many of whom are unaware of the financial and emotional risks associated with their platforms. These advertising tactics underscore Defendants' calculated effort to maximize profits while evading the accountability and consumer protections required of licensed gambling operations.

## FACTS SPECIFIC TO PLAINTIFF BOATNER

91.    Plaintiff Boatner has been playing Zula, Sportzino, and Fortune Coins games since approximately July 2024.

92.    After using the limited number of Sweeps Coins obtained through Defendants' promotions, Plaintiff purchased Sweeps Coins through each one of Defendants' online stores in order to continue playing. When Plaintiff ran out of Sweeps Coins, she would purchase more even though she still had many Gold Coins.

93.    Thereafter, Plaintiff continued playing various slot machines and other games of chance within Fortune Coins, Sportzino, and Zula, where she would wager Sweeps Coins for the chance of winning real cash prizes. Just in the last three months, Plaintiff has wagered and lost (and Defendants therefore won) more than $50 at Fortune Coins' games of chance, more than $50 at Zula's games of chance, and more than $50 at Sportzino's games of chance.

## CLASS ACTION ALLEGATIONS

94.    **Class Definitions**: Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on behalf of herself, a New York Class, and New York Loss Recovery Subclasses (collectively, the "Classes") defined as follows:

> **New York Class**: All persons in New York who have paid money to wager on Defendants' online casino games.

> **Loss Recovery Subclass**: All persons in New York who have lost $25 or more wagering on Defendants' online casino games within three months of the filing of this Complaint.

Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

95.    **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, thousands of consumers fall into the definition of the New York Class and Loss Recovery Subclass. Members of the Classes can be identified through Defendants' records, discovery, and other third-party sources.

96.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions include, but are not limited to, the following:

(a)    Whether Defendants are the proprietors for whose benefit the online casino games are played;

(b)    Whether Defendants' online casino games are illegal under New York gambling laws;

(c)    Whether Plaintiff and each member of the Classes lost money by gambling on Defendants' online casino games;

(d)    Whether Plaintiff is entitled to recover her gambling losses under the New York loss recovery statute, N.Y. Gen. Oblig. Law §§ 5-419,

5-421;

(e)    Whether Defendants violated the New York General Business Law § 349 (Deceptive Acts and Practices);

(f)    Whether Defendants violated the New York General Business Law § 350 (False Advertising); and

(g)    Whether Defendants have been unjustly enriched as a result of its conduct.

97.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendants' uniform wrongful conduct.

98.    **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Classes, as Plaintiff and each member of the Classes lost money playing Defendants' illegal casino games. Plaintiff also has no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to the Classes.

99.    **Policies Generally Applicable to the Classes**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward members of the Classes, and making final injunctive relief appropriate with respect to the Classes as a whole. Defendants' policies and practices challenged herein apply to and affect members of the Classes uniformly, and Plaintiff's challenge of these practices and policies hinges on Defendants' conduct with respect to the Classes as a whole, not

on facts or law applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to the other members of the Classes are the same.

100. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The harm suffered by the individual members of the Classes is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

101. Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
### N.Y. Gen. Oblig. L. § 5-419
### (On behalf of Plaintiff and the New York Class)

102. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

103. Plaintiff brings this claim on behalf of herself and the New York Class under New York General Obligation Law § 5-419 (referred to collectively with § 5-421 as the "Loss Recovery Statute"), which was enacted to effectuate the State's public policy against unlawful gambling.

104.    All forms of unlicensed gambling—including wagers, bets, or stakes—based on games of chance are unlawful in New York. N.Y. Gen. Oblig. L. § 5-401.

105.    Section 5-419 of the Loss Recovery Statute provides: "Any person who shall pay, deliver or deposit any money, property or thing in action, upon the event of any wager or bet prohibited, may sue for and recover the same of the winner or person to whom the same shall be paid or delivered, and of the stakeholder or other person in whose hands shall be deposited any such wager, bet or stake, or any part thereof, whether the same shall have been paid over by such stakeholder or not, and whether any such wager be lost or not." N.Y. Gen. Oblig. L. § 5-419.

106.    Accordingly, this provision of the Loss Recovery Statute prohibits a person or entity from profiting from gambling activity—whether or not they are the actual "winner" of the wager or bet—and permits the person who paid or lost the money to recover it from the recipient.

107.    Defendants' casino games solicit "wager[s] or bet[s] prohibited" because they invite users to play games of chance (e.g., online slot machines) for money or other things of value (Sweeps Coins), which constitutes illegal gambling under both New York civil and penal law. *See* N.Y. Gen. Oblig. L. § 5-401 ("All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful."); N.Y. Penal Law § 225.00 (defining "gambling" as the "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance" and defining "gambling device," as "any device, machine, paraphernalia or equipment which is used or usable in the playing phases of any gambling activity, whether such activity consists of gambling between persons or gambling by a person involving the playing of a machine."); N.Y. Penal Law §§ 225.05-225.10 (making advancing and profiting from unlawful gambling a misdemeanor or felony).

108.    Defendants' online casino platforms—Fortune Coins, Sportzino, and Zula—allow

users to purchase Sweeps Coins, which can be wagered on digital slot machines and other games of chance. If users win Sweeps Coins after wagering them on these games, they can be redeemed for real currency much like casino chips can be exchanged for cash in a brick-and-mortar casino.

109.    Defendants own, operate, and control the gambling games described herein and directly profited from Plaintiff's and the New York Class members' gambling losses. Defendants' casino games do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendants are "winners" under the Loss Recovery Statute because they have a direct stake in the result of the gambling. When players wager Sweeps Coins and win, they can cash out the Sweeps Coins they win for real money—i.e., Defendants lose the dollar amount of the Sweeps Coins that the player won. In contrast, when players wager Sweeps Coins and lose, Defendants win the value of the Sweeps Coins that the players lose.

110.    Defendants Blazesoft and Blazegames are also "stakeholders" under this provision of the Loss Recover Statute because, on information and belief, the money wagered by Plaintiff and the New York Class on Defendants' games of chance was delivered or deposited into accounts owned or controlled by them.

111.    By paying money to wager Sweeps Coins on Defendants' casino platforms, Plaintiff and the New York Class members have paid and lost significant sums of money to Defendants through their unlawful gambling platforms.

112.    Plaintiff's and the New York Class members' losses occurred in New York because Defendants' online casino games were played by New York residents on computers, mobile phones, and mobile devices in the State of New York. Defendants had actual knowledge that Plaintiff and the New York Class members reside in New York because each of them selected

"New York" as their state of residence and provided their complete home address pursuant to Defendants' mandatory registration process.

113.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendants to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law § 5-419.

**SECOND CAUSE OF ACTION**
**N.Y. Gen. Oblig. Law § 5-421**
**(On behalf of Plaintiff and the Loss Recovery Subclass)**

114.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

115.    Plaintiff brings this claim on behalf of herself and the Loss Recovery Subclass under § 5-421 of the Loss Recovery Statute, which provides that "[e]very person who shall, by playing at any game, or by betting on the sides or hands of such as do play, lose at any time or sitting, the sum or value of twenty-five dollars or upwards, and shall pay or deliver the same or any part thereof, may, within three calendar months after such payment or delivery, sue for and recover the money or value of the things so lost and paid or delivered, from the winner thereof." N.Y. Gen. Oblig. Law § 5-421.

116.    Defendants' Sweep Coins are money or things of value because they are directly tied to the U.S. Dollar and can be redeemed for real money through Defendants' casino platforms, much like casino chips can be exchanged for cash in a brick-and-mortar casino.

117.    By paying for Sweeps Coins, then wagering and losing those Sweeps Coins while playing games of chance on Defendants' casino platforms, Plaintiff and members of the Loss Recovery Subclass have paid and lost money to Defendants.

118.    Plaintiff and the members of the Loss Recovery Subclass have paid and lost more than $25 dollars gambling on Defendants' platforms in the three months preceding the filing of

this Complaint.

119.    Defendants' casino games do not permit players to gamble directly against other players. Rather, like the "house" in a traditional brick-and-mortar casino, Defendants are "winners" under this provision of the Loss Recovery Statute because they have a direct stake in the result of the gambling. When players wager Sweeps Coins and win, they can cash out the Sweeps Coins they win for real money—i.e., Defendants lose the dollar amount of the Sweeps Coins that the player won. In contrast, when players wager Sweeps Coins and lose, Defendants win the value of the Sweeps Coins that the players lose.

120.    Defendants are also the "winners" under the Loss Recovery Statute because they own, operate, and control the gambling games described herein, and directly profited from Plaintiff's and the Loss Recovery Subclass members' gambling losses.

121.    Plaintiff's and the Loss Recovery Subclass members' losses occurred in New York because Defendants' online casino games were played by New York residents on computers, mobile phones, and mobile devices in the State of New York. Defendants had actual knowledge that Plaintiff and the Loss Recovery Subclass members reside in New York because each of them selected "New York" as their state of residence and provided their complete home address pursuant to Defendants' mandatory registration process.

122.    Plaintiff, on behalf of herself and the Loss Recovery Subclass members, seeks an order requiring Defendants to (1) cease the operation of its gambling devices, and (2) return all lost monies, with costs, pursuant to N.Y. Gen. Oblig. Law §5-421.

**THIRD CAUSE OF ACTION**
**New York General Business Law § 349 (Deceptive Acts and Practices)**
**(On behalf of Plaintiff and the New York Class)**

123.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

124.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. GEN. BUS. LAW § 349(a).

125.    N.Y. GEN. BUS. LAW § 349 applies to Defendants' actions and conduct as described herein because it is a broad consumer protection statute that prohibits recurring deceptive acts or practices in business transactions, including those involving the marketing and sale of goods or services to New York consumers.

126.    Plaintiff and the members of the New York Class are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

127.    Defendants' practices described above, including their operation of illegal casino platforms and sale of Sweeps Coins, are deceptive under N.Y. GEN. BUS. LAW § 349 because they contravene New York's public policy against unlawful and unregulated gambling, and caused substantial injury to the consumers who purchased Sweeps Coins on the Fortune Coins, Sportzino, and Zula casino platforms.

128.    Defendants caused substantial injury to Plaintiff and the New York Class by inducing them to purchase Sweeps Coins through the design of their Fortune Coins, Sportzino, and Zula illegal gambling platforms. The injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition, and the injury is one that consumers themselves could not reasonably have avoided.

129.    Defendants' unfair practices occurred during the marketing and sale of Sweeps Coins for use on the Fortune Coins, Sportzino, and Zula illegal gambling platforms, and thus, occurred in the course of trade and commerce.

130.    Defendants represent to consumers, including Plaintiff and the New York Class,

that their platforms "**DO NOT OFFER REAL MONEY GAMBLING**" (emphasis in original) and mislead consumers into believing that they are not engaging in gambling by wagering Sweeps Coins on the casino games offered on the Sportzino and Zula Casino platforms.

131.    Further, Defendants conceal from consumers, including Plaintiff and the New York Class, that wagering with Sweeps Coins on their Fortune Coins, Sportzino, and Zula platforms constitutes illegal gambling prohibited by state law.

132.    To make matters worse, Defendants fail to provide the statutorily required consumer protections that every licensed casino in the State of New York must provide. For example, Defendants allow anybody over the age of 18 to gamble on its casino platforms in complete disregard of the laws barring individuals under the age of 21 from gambling. *See, e.g.*, N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 1332(1) ("No person under the age at which a person is authorized to purchase and consume alcoholic beverages shall enter, or wager in, a licensed gaming facility"); N.Y. COMP. CODES R. & REGS. TIT. 9, § 5313.2(b) ("A gaming facility licensee shall post signs that include a statement that is similar to the following: 'It is unlawful for any individual under 21 years of age to enter or remain in any area where gaming is conducted. It is unlawful for any individual under 21 years of age to wager, play or attempt to play a slot machine or table game. Individuals violating this prohibition will be removed and may be subject to arrest and criminal prosecution.' Such signs shall be posted prominently at each entrance and exit of the gaming floor"); § 5313.2(c) ("A gaming facility licensee shall identify and remove any person who is under 21 years of age and not otherwise authorized by law to be on the gaming floor and immediately notify onsite commission staff when a person under 21 years of age is discovered on the gaming floor, in areas off the gaming floor where gaming activity is conducted or engaging in gaming-related activities"); § 5329.19(a) ("No person under 21 years of age may place a wager

with a casino sports wagering licensee").

133.    Defendants also disregard the consumer protection laws that require casinos to conspicuously post signs that inform patrons how to obtain assistance with problem gambling and provide instructions on accessing the New York's Voluntary Self-Exclusion Program. *See, e.g.*, N.Y. COMP. CODES R. & REGS. TIT. 9, § 5325.2(a) (requiring each gaming facility licensee to "submit for commission review and approval a problem gambling plan"); § 5325.4(a) (requiring each gaming facility licensee to "submit to the commission quarterly updates and an annual summary of its problem gambling plan and goals"); § 5325.5 (requiring each gaming facility licensee to "post signs in a size as approved in writing by the commission that include the problem gambling assistance message" approved by the commission); § 5325.6(b) (requiring all advertisements to "contain a problem gambling assistance message comparable to one of the following: (1) If you or someone you know has a gambling problem, help is available. Call (877-8-HOPENY) or text HOPENY (467369); (2) Gambling Problem? Call (877-8-HOPENY) or text HOPENY (467369); or (3) any other message approved in writing by the commission"); § 5325.6(c)(4)(i) ("for websites, including social media sites and mobile phone applications, the problem gambling assistance message must be posted on each webpage or profile page and on any gaming-related advertisement posted on the webpage or profile page"); § 5327.2 ("Each gaming facility licensee shall exclude from its premises any person who such gaming facility licensee knows meets the exclusion criteria"); § 5327.3 ("The placement of a person on the excluded persons list shall have the effect of requiring the exclusion or ejection of the excluded person from all New York State licensed gaming facilities"); § 5329.34 ("Each casino sports wagering licensee and sports pool vendor licensee shall comply with the problem gaming, self-exclusion and excluded person requirements").

134.    Defendants aggressively market and advertise their Fortune Coins, Sportzino, and Zula platforms on social media while at the same time concealing that they are illegal under state law. As such, New York consumers, including Plaintiff and the New York Class, are highly likely to continue to encounter current and future iterations of Defendants' illegal platforms absent injunctive relief.

135.    Further, Defendants' conduct is immoral because it is designed to encourage illegal gambling while marketing their casinos as legal simulation of casino-style games, as well as to exploit psychological triggers associated with gambling and addiction in order to target susceptible populations.

136.    As a direct and proximate result of Defendants' violations of N.Y. GEN. BUS. LAW § 349, Plaintiff and the New York Class members have suffered harm in the form of monies paid and lost for Defendants' Sweeps Coins.

137.    Defendants' deceptive conduct is consumer-oriented and has a broad impact on the public, as it affects thousands of New York consumers who are exposed to Defendants' deceptive marketing and promotional materials.

138.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiff and the New York Class, and (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**FOURTH CAUSE OF ACTION**
**New York General Business Law § 350 (False Advertising)**
**(On behalf of Plaintiff and the New York Class)**

139.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

140.    N.Y. GEN. BUS. LAW § 350 provides that "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." N.Y. GEN. BUS. LAW § 350.

141.    Defendants engaged in false advertising by making materially misleading statements and omissions in their marketing and promotion of Fortune Coins, Sportzino, and Zula. Defendants represent to consumers, including Plaintiff and the New York Class, that their platforms "DO NOT OFFER REAL MONEY GAMBLING" (emphasis in original), when in reality, consumers are wagering real money through the purchase and use of Sweeps Coins.

142.    Defendants further misrepresent Fortune Coins, Sportzino, and Zula as "sweepstakes" platforms rather than unlicensed online casinos. By doing so, Defendants create the false impression that their platforms are lawful and that consumers are merely engaging in risk-free social gaming rather than illegal gambling.

143.    Defendants' advertisements fail to disclose that their platforms operate in violation of New York law, that consumers are engaging in real-money gambling, and that Sweeps Coins constitute things of value that can be lost while playing Defendants' casino-style games. These omissions are material because they would influence a reasonable consumer's decision to engage with Defendants' platforms.

144.    Defendants aggressively market their illegal casino platforms through targeted advertisements on social media, digital marketing campaigns, and other promotional efforts aimed at attracting New York consumers. These advertisements emphasize free-to-play gaming, large potential winnings, and enticing promotions while concealing the true nature of Defendants' gambling operations.

145.    Defendants' false and misleading advertising deceived Plaintiff and members of

the New York Class, leading them to engage with Defendants' platforms under the mistaken belief that they were not participating in illegal gambling.

146.    Defendants' false advertising is consumer-oriented and has a broad impact on the public, as it affects thousands of New York consumers who are exposed to Defendants' deceptive marketing and promotional materials.

147.    As a direct and proximate result of Defendants' false advertising, Plaintiff and the New York Class have suffered actual damages, including money lost through the purchase of Sweeps Coins.

148.    Plaintiff, on behalf of herself and the New York Class members, seeks an order requiring Defendants to (1) cease the deceptive practices described herein, (2) return all monies acquired through any purchase that included the transfer of Sweeps Coins to Plaintiff and the New York Class, and (3) pay damages, interest, and reasonable attorneys' fees, together with costs and expenses.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On behalf of Plaintiff and the New York Class)**

149.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

150.    Plaintiff and the New York Class members have conferred a benefit upon Defendants in the form of the money they paid for the purchase of Sweeps Coins to wager on Defendants' illegal casino platforms.

151.    Defendants appreciate and have knowledge of the benefits conferred upon them by Plaintiff and the New York Class.

152.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiff and the New York Class members, which

Defendants have unjustly obtained as a result of their unlawful operation of casino games. As it stands, Defendants have retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

153.    Accordingly, Plaintiff and the New York Class members seek full disgorgement of all money Defendants have retained as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Boatner, individually and on behalf of the Classes, respectfully request that this Court enter an Order:

(a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiff as the representative of the Classes, and appointing her counsel as Class Counsel;

(b)    Declaring that Defendants' conduct, as set out above, is unlawful under N.Y. Gen. Oblig. Law §§ 5-419 & 5-421 and N.Y. GEN. BUS. LAW §§ 349 & 350;

(c)    Entering judgment against Defendants in the amount of the losses suffered by Plaintiff and each member of the Classes;

(d)    Enjoining Defendants from continuing the challenged conduct;

(e)    Awarding damages to Plaintiff and the members of the Classes in an amount to be determined at trial, including trebling as appropriate;

(f)    Awarding restitution to Plaintiff and the members of the Classes in an amount to be determined at trial;

(g)    Requiring disgorgement of all of Defendants' ill-gotten gains;

(h)    Awarding reasonable attorneys' fees and expenses;

(i)    Awarding pre- and post-judgment interest, to the extent allowable;

(j)      Requiring injunctive and/or declaratory relief as necessary to protect the interests

of Plaintiff and the Classes; and

(k)      Awarding such other and further relief as equity and justice require, including all

forms of relief provided for under Plaintiff's claims.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: April 18, 2025                  Respectfully Submitted,

**AUTUMN BOATNER,** individually and on behalf of all
others similarly situated,

By:   */s/ Matthew S. Tripolitsiotis*
Counsel for Plaintiff

Matthew S. Tripolitsiotis (SDNY Bar Code: MT9413)
mtripolitsiotis@burnscharest.com
BURNS CHAREST LLP
757 Third Ave, 20th Floor
New York, NY 10017
Tel.: (469) 895-5269

J. Eli Wade-Scott (*pro hac vice* forthcoming)
ewadescott@edelson.com
Michael Ovca (*pro hac vice* forthcoming)
movca@edelson.com
Hannah Hilligoss (*pro hac vice* forthcoming)
hhilligoss@edelson.com
Ari J. Scharg (*pro hac vice* forthcoming)
ascharg@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel.: (312) 589-6370

*Counsel for Plaintiff and the putative classes*